151672, USA v. Alexander O. Norwood 151674, USA v. Jonathan Oldman 151677, USA v. Jonathan Walker 151692, USA v. J. Timothy Walker Oral argument to be 30 minutes, shared by the defendants, and 30 minutes per defendant.   Mr. Jager for the appellate. Thank you. And we understand that each of you are going to have five minutes, and then each of you will have one minute rebuttal. That is correct. All right. You may proceed. Could the counsel get seated for just a second? Oh, sure. Yeah, of course. May it please the court and counsel, my name is Steve Jager, and I do represent Jonathan Oldman. The critical issue that I would like to argue this morning in this case is whether the district court abused its discretion when it denied the motion for mistrial, and allowed the case to proceed the verdict with an intimidated and impaired jury who exhibited bias in fact. The points to be made are as follows. This case is overshadowed from the very beginning pretrial conferences to the end of the case by violence, intimidation, and murders. The court was concerned by the nature of this case when it decided to seat an anonymous jury. So the judge is aware the whole time that this is a big issue in this case. The trial begins, I believe, on June 2, 2014. The jurors exhibit concern as early as June 11, 2014. One of the jurors who is unidentified in the record goes to the court staff and says, are these defendants in custody? They're concerned about the evidence that they're hearing. On June 16, juror number three, who turns out to be one of the deliberating jurors, goes to the clerk or staff and says, I am really stressed by what's going on. I am concerned about the defendants' behaviors. I am concerned that they're not taking this seriously. The judge decides to interview the jury, that juror on the 16th, and when asked, the juror talks about not the defendants' behaviors, but the behaviors of his fellow jurors. It's not specified what those behaviors are, but he is concerned about what's going on. He wants to be left alone. He's sort of a loner-type fellow. The court makes no inquiry of the inconsistencies in those statements. The court makes no inquiry of the staff to which the report was made. Was it the defendants' behaviors? Was it the fellow jurors' behaviors? On June 17, the next day, multiple reports were made to the court by other jurors about being exposed to extrinsic contacts by persons that they associate with the defendants. Talking about the parking lot and the following home and all that. The parking lot, the following home, and the jurors, and the court seems to overlook the fact during the Rimmer hearing and the interviews, these circumstances of this case. He's in the middle of this storm. The jurors are concerned multiple times. Of the deliberating jurors, several of them experienced the contacts. Some of this boils down to whether the jurors say they can remain impartial. All but, I think, two gave the district court that assurance. The district court excused the two, put alternates in those persons' place, and otherwise, the court, in its discretion, after seeing these folks firsthand, decided that it thought the assurances of impartiality were credible. You really need something that is pretty compelling to have us set aside the judge's discretion on that, don't you? I would agree the court has discretion, but that discretion is subject to the essential demands of fairness. I think what the problem is, under the existing precedent, he has to have this Rimmer hearing and do these interviews with counsel present, but he also has to look at the compelling circumstances of the case. You can only rely on the jurors' answers to the questions if you ask the right questions. He didn't ask the right questions. Unlike the court in Pinell, the inquiry of the panel and the individual was neither thorough nor complete, and that's especially true When you look at the inquiries that were made of Juror 3, where the court assumes in the second interview on June 17th that Juror 3 can be fair and impartial, he doesn't really ask that question at that time. He doesn't examine the circumstances. For Juror 10, he does ask those circumstances, but there's a second and third interview of Juror 10. Juror 10 is examined on June 17th and then twice on June 27th. On June 27th, that juror says, I was followed to the new parking lot where the court, again concerned about security, moved the parking arrangements. That juror says, I have a gut feeling. These are unusual with everything that's going on. I have uneasy feelings. Yet that person pretty courageously said, I can be impartial. It's like an admission against interest. Why isn't that even more credible? Because that juror also says, we don't know what's going on. That implies the other jurors are also talking about this and aware of these things. The court, I believe, under existing case law, had the duty to inquire the other jurors during that second round, and he doesn't do that. Any questions? All right. Well, you'll have your rebuttal. Thank you. Thank you, sir. Good morning, Your Honors. Earl Gerowitz on behalf of Alexander Norwood. I would like to address the three RICO issues that I have raised on behalf of Mr. Norwood. They concern, and they're related, they concern sufficiency of the evidence for the RICO enterprise based upon the Boyle standard, which states that it tests the outer limits of what that may be. Second was the shooting that was alleged for which there was evidence of Jonathan Parker, done for the purpose by Mr. Norwood to maintain or increase his position in the enterprise. And in this court's terms, under Hackett, was it an animating purpose. And three was the RICO liability for which Mr. Norwood was sentenced to life terms, based on allegations that were in the indictment. And, of course, the judge specifically referred to the shooting of Omar Bashir as one of the reasons for imposing a life sentence. That allegation was nowhere in the indictment. It wasn't alleged, and the jury was not asked to make any determination. I think the initiating concern that you started with may be a very important point to make. How is it that the enterprise, the association, in fact, RICO enterprise, is found in a case based on gang or just neighborhood violence in a subcategory of society that's poor and perhaps undereducated? I think your argument at core is how do you differentiate, as I understand it, and I want you to explicate it, is how do you differentiate it between a subculture in a poverty-stricken area that is a violent culture and what is necessary to show that that, in fact, satisfies the enterprise definition? So give us why this is not Howard's boys aren't sufficiently organized to satisfy that requirement. Yes, Your Honor, I think that really is a core question, particularly as to Mr. Norwood, because the facts as to Mr. Norwood only indicate that he was around the Howard Street neighborhood from the time period up to about 2005 when he moved out after someone was shot and the next year he was incarcerated and remained incarcerated continually through the trial and up to the present time. The characteristics that are demonstrated in his case are that, as alleged, he participated in two sales of crack cocaine. There is an absence of evidence that there was any coordination, direction, or relationship to anyone else in those two sales in 2002 of crack cocaine for which he was arrested by a local police department. Similarly, with regard to the murder of Jonathan Parker in 2004, the evidence is absent that there is an absence of evidence that there was any direction, control, or relationship to a gang structure or enterprise. So that carries forward. All that is really present then is that people said that Mr. Norwood had a reputation for being tough. It's my position, and I think it's supported by the record, that that is an inherent characteristic of anybody who happened to have the misfortune, I would say unfortunately, of growing up in the Howard Street neighborhood. In order to be a person who could survive going to school without getting beat up and engaging in drug sales, as what people did there, a person had to be tough. That is why, according to Mr. Eddie Williams, who said that he engaged Mr. Norwood to shoot Jonathan Parker, he did it because he had that reputation. Charles Orr, Mr. Norwood's cousin who testified as a government witness, said that after the shooting it was apparent to him that Mr. Norwood's reputation in the neighborhood for toughness had increased. Those are not characteristics, I think, which distinguish Mr. Norwood as a participant in a gang, as these activities as part of a gang, or in this court's description in Hackett as having gone to extraordinary lengths or great lengths to participate in these activities. The murder was an instance of going to pretty great lengths, wasn't it? I'm sorry? When he volunteers to murder Parker when the other person makes a phone call and your client's there, I guess, when somebody else takes the call and your client says, I'll do it for $2,000, that's going to pretty extraordinary lengths, isn't it? Well, I think that that has to be taken in context. There was no evidence, there was no testimony from anyone that this represented something that was extraordinary in the circumstances of the people who lived in that neighborhood. It was certainly done in daylight. There were other people who were alleged to be participants in this group who were around. But this relates to the question of what is Mr. Norwood's reputation? And did he do that as part of a gang reputation? It's distinguished from a personal reputation. The government wants to equate reputation with status. And here we have Mr. Norwood coming into this group living with a reputation and that's all the government really relies upon, at least I would contend, to make him a gang member. And having participated in that event, I think, doesn't show that he went to extraordinary lengths to increase or maintain that particular status. I have a question. Your position on the enterprise question really boils down to the particulars of your client, the very slim drug involvement or convictions or captures, and the fact that he was gone after 2005 and then incarcerated after 2006. Do you take on the question of whether this is truly a gang entity in the Howard Boys or whatever the name is? I focused on Mr. Norwood's involvement to analyze whether or not there's an enterprise because his activities and his participation was during the time period up to 2005. These activities morphed over that time period. The government has not presented in their vast description of testimony. It presented time periods and dates for events. I presented a chronology in my reply which goes through this. Based upon those activities as measured by my client's participation, the activities of any association which might relate to him does not establish evidence that is sufficient under Boyle or Olinga. Okay. Thank you. Good morning, Your Honors, and may it please the Court. I'm here this morning representing Jim Timothy Walker. I would like to focus the Court's attention on the murder and aid of racketeering account that Mr. Walker was convicted of. It kind of piggybacks a little bit on my predecessor's argument. But what this comes down to is the difference between effect, potential effect, and desired effect. The government is required, pursuant to the statute and pursuant to this Court's precedence, to prove desired effect, and they did not present any evidence to do so in this case. What issue are we talking about here? Murder and aid of racketeering, this is the element of maintaining or increasing your status within the organization. Bi-car, we're talking about? Bi-car, that is correct. So the issue is, according to Hackett, the animating purpose of committing the murder to maintain or increase the role within the enterprise. And this is the murder of Marion Hardy? Yes. Yes, Your Honor. The murder was this? I mean, there are a lot. Yeah, this was Marion Hardy. Both brothers? Yes, there's two brothers. And so the factual scenario of this is that it's late at night. We have Mr. Brown and Mr. Hardy that are out on a cigarette run. Mr. Brown does a drug deal. And in the meantime, both of the Walker brothers go up to Mr. Hardy, and there's a disagreement between the three of them. Mr. Hardy takes off his shirt so that he can fight them, and then the Walkers shoot them. That's this murder. And so the issue is, did that occur, at least in large part, so that the Walkers, especially Timothy Walker, would maintain or increase his role within the organization? Because that's what the government has to prove in this case, and there is no evidence in the record to support that fact. There were three eyewitnesses to the occurrence. They were all – What was your bragging after the fact? But that doesn't show that the purpose of why they did it was to maintain or increase their role within the enterprise, and it certainly does nothing to show that Timothy Walker's purpose was that. That was Jonathan Walker that bragged about that. The government has to have some evidence in the record to show, why did Timothy Walker do what he did? The evidence in the record is that he had a disagreement with Mr. Hardy, and because of that, Mr. Hardy lost his life. That much is clear. So then it comes down to, what was the murder part of the enterprise that night? And so we have three eyewitnesses, two of which are admitted Howard boys, and one who says that he's not a Howard boy. Isn't it enough if the murderer would advance his status within the enterprise as opposed to advancing the purposes of the enterprise? No, it's not, and that's where I say that there's a difference between effect, potential effect, and desired effect. What case is going to capture the distinction you're talking about? Hackett gives us a clear distinction because Hackett says that the animating purpose of the murder has to be, so at the time the murder occurs, not afterwards, because there's all kinds of effects that can happen. Let me just be very candid with you. There's a very slight basis here to do what your client did. Why couldn't a jury say the animating purpose is that Walker was disrespected by Hardy? He cannot let that happen and maintain his status in the gang, and so for the intended purpose of maintaining his status, he shoots the man. Because of all the other facts that occurred that night. We have these three eyewitnesses. Like I said, two of them are Howard boys that are these eyewitnesses to what occurred. Neither of those Howard boys jump in to assist the Walker brothers at that time. Others would say, of course, and they want to see if he can handle this. It's your own business. What the evidence that the government put on was that that's the opposite of what the code was. What the code was is if you have a fellow Howard boy that's in a fight, you all jump in to help them. So we have here Roderick Dudley and we have here Xavier Turner that specifically said, we didn't jump in because we had nothing to do with that. Well, if they had nothing to do with that, then it wasn't part of the enterprise and it wasn't part of the code. Contrary to that, we have Mr. Brown who said that if you sell, his testimony was if you sell drugs in the Howard Estates and you're not a member, you get killed. And then he goes on 10 pages later to say, I sold drugs that night in front of the Walkers and the Walkers never went after him that night. So if the Walkers were acting in furtherance of the enterprise, Michael Brown who was the third eyewitness was the not Howard boy. So if they were acting in furtherance of the enterprise, why did they not go after the person that right in front of them sold drugs who wasn't a Howard boy in Howard Estates that night? Okay, thank you. Thanks. You all have your rebuttal. Good morning, Your Honors. My name is Randall Roberts. I appear today on behalf of Mr. Jonathan Walker, whose father, by the way, is present. The medical examiner's testimony in this case involving the Marion Hardy shooting eliminated the second shooter. My client, John, didn't shoot Hardy. The eyewitnesses said he did. Well, Hardy was laying prone on the ground. Which murder are we talking about? The Marion Hardy murder, the one that counsel was talking about. Okay, the one we were just talking about. He was the one who I shot the body and you shot the head? Well, what the eyewitnesses testified to that my client ran over after J.T. pulled the gun out and shot him. My client, Jonathan, ran over and emptied his gun into him while he was prone on the ground. That was never supported by the medical evidence or any recovery items of evidence. It just didn't happen. One could easily – Okay, that's – I was going to focus on the castigar. Do you deny that he shot him once in the head? Do I? I mean, is there – There was no evidence of that. There was no evidence. No. And the statement of the I shot him in the body and you shot him in the head, I may have the statement wrong. That statement came from some other cooperating – there were a lot of snitch balls in this case who were trying to make their own beds better. I was going to focus, if I could, on the castigar issue. One could easily imagine that after this experience and after what happened to Jonathan Walker in this case, I would never again engage in a castigar debriefing with a client in the Eastern District of Michigan again. I can't take that position. I have to look at every single client and do what's best for them. But I can tell you this, judges, these castigar letters are totally changed now from what they were when we experienced this situation. Now they define terms. They actually say that a breach is the failure to take a polygraph or their declination to take one. This was a two-and-a-half-year segment that occurred between Proffer One and the government's spirited decision unilaterally that my client had breached with no other evidence of that except some snitch ball witnesses that contradicted. We can use a different term. I'm sorry, Judge. That's all right. It's not a big deal, but it's just a distraction. I'm sorry. There was no question that Jonathan engaged in this session, and he sat down and spoke with these agents on two different occasions, separated by almost a total year from each other. When we were told the government was going to release this information as part of their Jenks responsibility, we were close to trial, and they had completely switched their theory based upon cooperative witnesses that were discussing their own individual issues with the government. The government, at that time, after they made the unilateral declaration, that was the first time when I balked and said, hold the phone. What are you doing? That was the first time they brought up the subject of polygraph. Oh. Yes. Wasn't that part of the original discussion, though? No. The original agreement, Your Honor, if you will look at the pleading that I – That he had to take a polygraph and pass it. They had the right to ask him for a polygraph, but they didn't – And did you know that they had asked him for a polygraph and that he refused to take it? I was right there with him, Judge, during the hearing when that happened. Well, you know, I think it's only reasonable to assume that you, having said you would take a polygraph, and then if you say you're not going to take a polygraph, it's because you suspect you're going to fail the polygraph. Why else would you not take it? Because two and a half years later, when they've obviously set their sights differently, the government, that is, and have made their determination already without offering him a polygraph, there's no way in the world that man is going to pass a government-sponsored polygraph at that point. All they need to have is a conflict. The needles don't blow off the chart. They just say, well, this is not exactly – there's something wrong here, and he would flunk. Our protection was not to take the polygraph that wasn't demanded in the contract language. And so then they say to you, well, we're going to introduce this evidence, and you have an objection on the record at that time. I made a motion to block, under seal, and asked that they please don't release until we've litigated it. All this is going on, co-defendants don't even know about it at this point. And it was after the hearing and after the judge's ruling then that where the judge inserted this language into the contract, and he shouldn't have. That's what I'm saying. The judge supplied an additional layer of protection for the government, and that's way beyond what the – You're talking about the judge saying that declining to take the polygraph would put him in the same position as flunking it. The judge basically said he didn't – it was a distinction without a difference as far as he could see. As far as breach is concerned, right, because they had the right to take it. The contract language is very clear. Their remedies are outlined in there, but there's nothing that says if he declines, that's a breach. But it says the government has a right to take it. I thought that was common ground here. Yes. Okay. I mean, it pretty clearly follows from that that if he refuses to take it and therefore denies them their contractual right, that's what a breach is. The difference, I think, Your Honor, if I can structure this the way I'm attempting to, is that they made the unilateral determination that he had breached back at session one. They just didn't bother to tell us for two and a half years. Nobody said, Mr. Roberts, we're not really sure what he's doing here, but we need to talk to him some more. We want to have him take a polygraph. They didn't. They invited him back for a second interview preparing him for a state court first-degree murder trial against Roger Dudley. And that trial, all the – excuse me, that proffer, all the information that Jonathan gave them, I used against Dudley in cross-examination, and he admitted it was all true. It was a first-degree. It was a contract hit that Dudley had arranged. John knew nothing about it. John didn't get any money for it. And Dudley admitted all that readily on the stand, also saying when I asked him, why are you doing this to your friend? Because he provided testimonies against me. Mr. Walker never testified. The government obviously showed Dudley his statements. So Dudley walks away with a misdemeanor – excuse me, a manslaughter conviction and a felony firearm conviction, and then he testifies against John. Okay. I do understand your point now about the two-and-a-half-year delay there. And interestingly enough, Your Honor – I mean, you can finish your sentence, but, you know, the red light is on. All right. Interesting – thank you. I'm sorry. I didn't see it. Okay. Interestingly enough, the government gratuitously agreed not to put in session number two in the trial. Well, first of all, they didn't need it anymore because by that point, unbeknownst to us, Dudley had pled. Secondly, how in the world could they say we can pick and choose what's true and what's not? We'll put session two in that we got by not even telling them he flunked session one. Okay. Thank you. All right. Thank you, sir. One more defendant. May the court please. Good morning, Your Honors. Glenn Simington, appearing on behalf of Mr. Leon Gills. By agreement, and that's in the court below and amongst the parties and at this level, we have agreed previously that any issues raised that are common issues to any one defendant were also raised and preserved as to others. So I'm not going to repeat anything like RICO. So that said, I do speak for Mr. Gills obviously this morning, and I do want to focus on two particular issues that I've raised in the brief. I rely on the brief generally as to the other issues. Both those issues have to do with sentencing considerations, one directly and one sort of indirectly, and I want to go into those in a moment. But before I do any of that, I want to stress, because it may have been missed, Mr. Gills stands alone. He is unique amongst all these defendants as someone who was neither found by a judge or a jury to have committed any murders or killed anyone, neither found by a judge or a jury to have inflicted any life-threatening injuries on anyone, and not found by a jury certainly to have ordered that anyone be killed. He's also the youngest member of this group and was actually incarcerated in juvenile detention centers for the bulk of the period of this alleged conspiracy. He's unique in those respects. Nevertheless, at the end of the day, the court found a way to sentence him to the same life in prison sentence as the rest of these folks. That's part of why I believe he was 21, I think. So the conspiracy did continue. Two counts of attempted murder that he was charged with. Yes, that's true. How old was he when he undertook those activities? I'm sorry? How old was he when he engaged in those activities? Those were in, I think, 2008, so he would have been 19, I believe. Thank you. So that leads into the first issue that I want to stress, and that has to do with the attempted murder of Charles Orr. This is an instructional error that I've raised in the brief, and I understand and we concede that the question of how a court deals with jury questions during deliberations is a matter that's left to the court's discretion, and that is the standard of review. What happened as far as this particular instance is concerned is that the court was faced with a question from the jury that contained factual predicates that made out, if you read the question, it's in the brief, they make out the crime of accessory after the fact. They do not make out the crime of aiding and abetting. The jury passed that question to the court. The court identified that question by name as hitting the fault line. It's the court's term, fault line between accessory after the fact and aiding and abetting. The court then refused to give an instruction on accessory after the fact and falsely, I believe, told the jury it was prohibited from giving an answer to that question, suggesting to the jury that they had asked a bad question, they'd asked a question that could not be answered. Under the Nunez case, I've cited in the brief and gone into a great deal of detail about, under Nunez, that was a question that the court was actually required to help the jury with as opposed to telling the jury that it was prohibited from doing so. That, to me, and that's my argument, crosses another fault line, and that's the fault line between use of discretion and abuse of discretion. The jury, under the Turner case, which I cited in the brief as well, the jury could very likely have walked away from, because they continued to ask this question. They asked various versions. They continued to ask questions about that. By the time they had done that, they had already been sent off in a direction, and again, I'd say the Turner case, which is in the brief. They had already been put in. The jury, if I recall, the jury asks the district judge whether somebody could aid and abet before they know that the other person is going to commit a crime. Is that a fair characterization of the question? Before the crime was committed, I believe, is a fair characterization of the question, which I've gone through and laid out in the brief. I think the question – Well, I mean, okay, I thought it was that in order, they asked, in order to aid and abet, do you have to know that a crime is going to be committed or that somebody intends to commit a crime? It was a component of their question. I agree. And the district court basically says yes, right? I mean, the district court says that to aid and abet, you have to decide to facilitate at least – you have to make the decision to facilitate a crime before the crime is over. No, actually, the court gave an instruction that said that you can facilitate that intention or knowledge during the commission of the crime. Well, that's consistent with what I just said, too. Okay, maybe I misunderstood. I mean, why isn't that just simply, you know, basically answering the jury's question? Well, ultimately, the court does that, but the court first tells the jury that it is prohibited from answering their question and lays claim to the idea that because it's a hypothetical question. Nunez clearly says that a court can answer a hypothetical question in the event that it is a question that is grounded in the evidence, and so I rely on Nunez. I see the light is on. Real quickly, I want to address the unconstitutional use of a prior state court offense to enhance Mr. Gill's sentence. And just quickly, that's a plain error issue. I've laid out the reasons in my brief. I think we meet the requirements. Is there a case that supports you on that where basically a court said it would be unconstitutional to apply, I think, the guideline here by its terms, right? I mean, the guideline says you do consider a state court conviction unless the conviction at state court is declared invalid or the defendant was denied his right to counsel in that proceeding, neither of which is true here. My reading of the guideline is that if it is a – it's not that the state court doesn't have to find it invalid. If it is an invalid sentence for a number of reasons. In this particular case, my argument is very clear. This is a Fifth Amendment due process violation because the warrant, the very warrant that was used in the state court was an illegal warrant. It led to an illegal arrest. It led to an illegal conviction and an illegal sentence, all in violation of the Fifth Amendment to the United States Constitution, which takes it into the category of – But let me just be straight that I understand. He had never challenged that conviction in state court, is that correct? He had not. His attorney had not, and I did not, fortunately, represent him in state court. But essentially that's why I believe that if that sentence is then used to enhance his sentence to put him into a life sentence category,  the words of the due process case is fairness, integrity, and the public reputation of the court. For Mr. Gills to be in this category, not having killed anyone. All right, thank you, sir. You all each have your rebuttal. Thank you very much. From Mr. Gatz. May it please the court. Andrew Gatz for the United States. The defendant's convictions here should be affirmed, starting with the RICO conspiracy convictions. As every court of appeals has held in similar circumstances post-Boyle, the gang here qualified as an association of fact enterprise. Judge Stranch, you asked earlier about the difference between a neighborhood and subculture and an association of fact enterprise. We are not asking this court to hold that a neighborhood or subculture qualifies as an association of fact enterprise. We are asking the court to hold that a gang does. And here – The question is here, why does this meet the qualifications? I will grant you that it is exceedingly difficult to think of any purpose for the type of shootings that went on in this case. But your job is to show that it was a purpose of enhancing status within the gang and that some sort of, even if it's what they call an association in fact, RICO enterprise existed. So explain to me why we don't have an inexplicable lifestyle versus that we do have a gang that qualifies as a RICO enterprise. Judge Stranch, I think there are two parts to your question. I'll try and answer them in turn. First is whether this enterprise itself qualifies as an association of fact enterprise. And the second, I think, relates to the by-car count, whether or not we've shown an animating purpose for each count. Right, it's for the purpose of maintaining our increasing position. I'll start with association in fact. I mean, one, we have witness after witness calling this a group or a gang, including Defendant Alexandra Norwood. If you look at pages 7748 to 7753, he confessed that he was a member of a group called the Howard Boys. That confession was admitted at trial. So you're not just taking all of the other witnesses' word who said that they were, that this was a gang. You're taking Alexandra Norwood's confession. And he says it's a gang? I don't know if he says it's a gang. Because it's the Howard Boys, Ho-Jo's, there are about 15 names across time before you get to the Mayor De Villa designation. What else about this organization do you think establishes either cohesion, organization, direction, hierarchical status? What are the things that really make it a gang and not a sad subculture? Let's walk through those one by one. This is not just that it was a gang, but that the members viewed themselves as part of the gang. That's an important point. They viewed themselves as part of the organization. This group also had rivalries. You don't have rivalries unless you're yourself like the groups you're having rivalries with. They had graffiti to identify their territory. They had territory. They had gang signs. They posted about the gang's activities and rivalries on social media. They got gang tattoos. They had secret handshakes. They had informal meetings. Yes, they did not have a hierarchical structure, but the Supreme Court was quite clear in Boyle that that is not required. So they did have all of these features showing the relationships among the members that they were part of an association of that enterprise. And the same sort of thing continues as members move in and out. It's clearly a fungible crowd, right? I'm not wrong. I want to be careful how I answer that. I think there are members moving in and out. I would dispute the Court's or Your Honor's question that they're fungible, and there is a pretty consistent group of members throughout the time period. Because they haven't been educated together or have grown up in the Howard area? What is the basis of that? So the testimony at trial was that members came from the neighborhood, but being part of the neighborhood itself didn't guarantee you were in the gang. In fact, if you looked at Norwood's confession at 7748 to 7753, he describes two different groups in that neighborhood. The Howard boys, which morphed into Myrteville, and then CAG, which was another group. So that's further evidence that the neighborhood itself wasn't what we were talking about here. It is the gang is what we were talking about here. What about Mr. Gerowitz's point in argument today that the government didn't present evidence showing that the enterprise was in place during the earlier periods, 2002 when Norwood sells some crack, and then I think 2005 when he does the Parker murder, during the periods that Norwood was active or took these actions? That simply is not consistent with the testimony, Your Honor, and I'll walk through the testimony with Sipes while we do that. Start again with the confession. Norwood not only confessed that he was a member of the group, he testified that he sold drugs every day in that area, and that only people in that group could sell there, and I'm referring now more specifically to 7751 to 7753. Xavier Turner testified that the group formed in 2002. Now that's page ID 7137 to 7141. Multiple witnesses testified that the organization was the same. It was Howard Boyce to start off and then morphed into Murderville. I can provide those sites as well. 6718, 6836, 6851, 7204, and then 9641 to 42. So it's a lot of different witnesses testifying that it's one consistent group throughout the trial. Getting back to Xavier Turner's testimony, Turner identified all of the defendants, including Norwood, as members. So it's not just Norwood's confession. It's Xavier Turner's testimony that Norwood was a member. That's 7170 to 7171. He testified that Norwood sold drugs in the Howard Estates every day, and that's at 7303. So it's not just two crack deals we're talking about that Mr. Gerowitz is trying to claim Norwood was involved in. It is selling drugs every day, and Norwood himself confessed to that and explained just how much money he made selling drugs in that territory every day. But selling drugs and keeping the money for himself. That is correct, Your Honor. The testimony was that they kept the money for themselves. Which operated independently. I dispute that. Operating independently in the sense that they kept money for themselves, not operating independently in whether they could sell there. That's the key point. They could only sell there because they were members of a gang. They pulled money to buy drugs. That's correct. They pulled money to buy drugs. There was an incident where Timothy Walker was caught with Leanne Gills and another member selling drugs. You see them caught red-handed selling drugs together. There's testimony they acted as lookouts for each other. There's testimony that when one ran out, they did something called five off the dub. Basically it's $5 in profit sharing for every $20 in sales. So it wasn't independent except in that they kept all the profits for themselves, Your Honor. I'm happy to answer any further questions about the association and theft portion of your question, Judge Stranch. Otherwise I'll move to the Vicar Counts. On the Vicar Counts, there are two categories of evidence here that I think combine for each murder and show that an animating purpose for each murder was maintaining or increasing the defendant's position in the enterprise. The first category of evidence is the gang's informal code of conduct, similar to Banks, similar to Witten, similar to Hackett, where you have an informal code of conduct that, one, gang members will respond to any slights or threats or disrespects. Two, their reputation and status within the gang depends on their violent reputation. Three, that they'll adopt each other's disputes. And four, that they're expected to engage in violence against rival gang members and drug dealers who infringe on their territory. So that's category one, that's the gang's code of conduct. Category two, similar to Hackett, similar to Banks, similar to Witten, similar to Camahiel, the Tenth Circuit case we mentioned, is the circumstantial evidence showing that each murder was intended, at least in part, that an animating purpose for each murder was to at least maintain the defendant's position in the enterprise. And that circumstantial evidence, again, falls into a couple of buckets here, at least two of which, often three of which, are present for each murder. One is the publicizing the nature of the dispute, publicizing the dispute beforehand within the gang because if you publicize a dispute and you enlist other gang members and then you don't go through with it, you will lose face in the gang. Second is publicizing the murder itself, committing it in a public way where you're trying to show other gang members what you're doing and the circumstances of the murder show that other gang members will see it and they'll see how tough you are and they'll see that you're complying with the gang's informal code of conduct. It is a notable feature of these gang cases that just murder after murder in broad daylight, broad daylight, people on the sidewalk, people at the intersection, and somebody just gets out and guns down the victim. It is, Judge Kesslidge, and oftentimes that's the key piece of circumstantial evidence. It was in Banks, it was in Hackett, it was in several of the other cases we've said. That's a key piece of circumstantial evidence showing that it was intended to comply with the code of conduct. Murder is not typically something people do in broad daylight. They try not to get caught. Murder carries stiff penalties. Even a rough-and-tumble gang member knows that murder probably is going to send him or her to jail for a long time, to prison for a long time. So committing it in broad daylight like that shows that they have a different purpose than just killing someone, that they have an animated purpose of complying with the gang's code of conduct. And then the third category of evidence here that circumstantially shows this animated purpose is, I think, the disproportionate nature of the responses here. And I think that ties into your question, Judge Kesslidge, it ties into this decision in Hackett where they take small slights, they publicize them within the gang, and then they do something incredibly horrible and disproportionate to what the initial slight was. So I'll address the two murders the defense counsel have talked about today and show how they sort of fit within that construct and fit within the case law. Let's start with the Jonathan Parker murder. Jonathan Parker had gotten on the wrong side of Eddie Williams, who was not a gang member, but who supplied the gang with guns, supplied the gang with drugs, was the gang's mentor, and was admired by these gang members. Williams had publicized it within the organization that he wanted retaliation against Jonathan Parker. And indeed, the day before the murder, two other gang members had gone looking for Jonathan Parker. And I'll refer the court to page ID 7393 to 7395 for that point. So this desire by their mentor to have Jonathan Parker killed had been publicized even the day before the murder. Then the day of the murder, Norwood volunteers for it publicly in front of other gang members. He uses those gang members to help find Jonathan Parker. He uses those gang members, once they reach the Magic Market, to scout out the Magic Market and find Jonathan Parker within there. Then he shoots Jonathan Parker in public in broad daylight, surrounded by those other gang members, while Jonathan Parker is running a bike. And he not only shoots Jonathan Parker, and this is a point that none of the parties said in their brief, he shoots Jonathan Parker while singing a song about it. If the court looks at page 7283 and 7400 to 7401, you'll notice testimony that he was singing a song about shooting someone while shooting someone. I mean, you do that to show how brazen and how tough you are. You don't usually sing while you're killing somebody. But that's what Alexandra Norwood was doing here. I think it's important to look at the counterfactual here. What happens if he goes through all that trouble? What happens if Eddie Williams asks him to do this? Eddie Williams hires him to do this? He volunteers in front of other gang members. He uses those other gang members to find Jonathan Parker, to scout out Jonathan Parker. He sings a song about shooting Jonathan Parker. And then he throws up his hands and says, no, I'm not going to do it. I'm not going to do it. I can't do it. He would have lost a considerable amount of faith with the gang. And I think that's an important point here. Because if you look at the counterfactual for all of these murders, had they not gone through with them and had the other gang members found out that they hadn't gone through, they would have lost a considerable amount of faith and their reputation and status within the gang would have suffered. How old was he at that event? Do you know? I do not know, Judge Tranch. I think if the court looks at his PSR and then combines that with the date of the shooting, it can do the math. But I really do not know offhand that far. 2005 shooting? This one was, I want to say this one was 2004. PSR doesn't seem to have his date of birth. Anyway. I apologize. I do not know. I don't believe they've raised that on appeal, Judge Tranch. So any argument on that point is waived. Young adults, all of them. Well, Williams is not. We know he's the mentor. But these are kids. I would dispute the characterization that they're kids. They're usually in their late teens, early 20s, and sometimes a little later. That's not quite kids. No, I agree. But I mean, not to put the point too strongly, Judge Tranch, but so were their victims. Oh, yes. And their lives were also ended quite horribly. Now, moving to the Marion Hardy shooting. He's 21. He's 21. Moving to the Marion Hardy shooting. Again, we have two of those buckets of evidence, circumstantial evidence, showing that the shooting there was intended, at least one animating purpose for that shooting, was to comply with the gang's code of conduct. We have public disrespect, and not just public disrespect, but public disrespect by Marion Hardy towards Judge Timothy Walker in the middle of the Howard Estates, the gang's home base, the middle of the Howard Estates, in public, while other gang members are sitting there. So we already have public disrespect that triggers the gang's code of conduct that they have to respond to slights and disrespect. You have a disproportionate response. I mean, Marion Hardy is expecting something. He's drunk. He's getting into it with Judge Timothy Walker. He's expecting some sort of fight, and he puts up his fist. Now, when someone puts up their fist, the natural response is to put up yours. Judge Timothy Walker doesn't do that. He pulls out a gun, taunts him, says, what's up now, and that's at page 10174. He actually taunts him publicly while all the gang members are watching, and then fires at him execution-style from point-blank range. Well, okay, one question I wanted to ask you based on the earlier argument is, I think it was Mr. Roberts said there was no medical evidence that supported the idea, or perhaps medical evidence refuted the testimony that Jonathan Walker comes in for the sort of coup de gras shot to the head. I'm not sure that's true. I don't think that's a fair reading of the testimony. I think the medical evidence was ambiguous about how he was shot and who shot him. I think there was evidence that there were two different types of guns used. That's consistent with the testimony. There's Jonathan Walker's DNA found on a cigarette right there, and that pretty closely puts him to the scene. There are also witnesses testifying that he was involved in the shooting. I mean, Mr. Roberts is asking the court essentially to draw a credibility finding against those witnesses. That is not something that is done on appeal under Rule 29. I have this phrase of, I shot him in the body and you shot him in the head, or I shot high and you shot low. Did one of those two brothers say that? Absolutely, Judge Strange, and that was my next point. It was Jonathan Walker who confessed to shooting him. So it's a bit odd for him to say there was no evidence that he shot him when he confessed to it. Getting to one point that Mr. Shad mentioned about the other gang members who are sitting here, we addressed that somewhat in our brief, but I'll reiterate a couple of points. One is there's no evidence that Judge Timothy Walker asked either of those gang members to help him with the flight. He asked Jonathan Walker, he said, quote-unquote, we need to whoop this boy are the words he used. There's no evidence he asked the others. That's point one. Point two is that those gang members both testified that they weren't particularly close with Judge Timothy Walker. In a gang this big, there are going to be factions, there are going to be members who are closer with each other than with others, and that was true here, too. And one thing I want to highlight is in Mr. Shad's reply brief, he says that one of the gang members testified that this had nothing to do with the Howard boys, and he directs this court, and this is an important site, to page 7432. Page 7432 actually dealt with a different murder. The witness was testifying about a different murder, not the Marion Hardy murder, and the court can read that at its leisure. So the key site that defense counsel has cited here on appeal actually doesn't support him at all. It deals with a different murder. I'm happy to answer any questions on any of the other Vicar shootings specifically or even more generally. What about Mr. Roberts' point that, as I understand it, that the government waited two and a half years after the breach? So which defendant is this? This is Jonathan Walker. Thank you. He refuses to take a lie detector test polygraph, and as I understand the argument this morning in my recollection from the brief is that he's complaining that the government took two and a half years to give notice that it thought that was a breach, and in the meantime it interviewed him a second time. Is that factually accurate? And if so, why do you think that is not troublesome? One, I'm not sure whether that's factually accurate, Your Honor. I don't recall offhand, and I apologize for that. But two, even if we assume that it is, I don't think it's a legally cognizable defense to what the plain language of the Catscar letter said. I mean, typically a witness is going to be interviewed early under a Catscar letter, and there's going to be a time gap between that interview and trial as the parties try and work out a plea. Whether or not the person who was interviewed triggers the provisions either by lying or refusing to take a polygraph that would permit his testimony at trial, that dispute happens at trial when they know the person was going to go to trial. So that's the... Do you know your position? When the first event occurs, the government knows whether they think it's a breach or not, and I understand you might not have to reveal it while you think you're finalizing some sort of agreement, but when you hit the spot that you're going to trial, why don't you then have to tell them? Well, two points, Your Honor. One, we might not know that early in the case the investigation is ongoing. I'm not sure there's evidence in the records suggesting we did know at the time. But the second point is... Wait, help me understand. He challenges whether you were correct in your assessment that there was a breach, and you're telling me that on down toward the trial, you don't know whether he breached or not. Am I misunderstanding you? I may misarticulate. That wasn't what I was trying to convey, Your Honor. I was trying to say that at the time of the initial interview, however much earlier that was, we might not have known that he was breaching, and that evidence as our case develops as we get closer to trial, we might realize that he lied and we'd like him to take a polygraph, and that's going to come up as we get closer to trial to answer the... When did he refuse the polygraph? Before trial. How far before trial? I do not recall. That would be in the record, though. I don't recall how far before trial. But in any event, it wasn't just... Are you talking years? I mean, years or not? Years. Did he refuse a polygraph shortly before trial or two and a half years thereabout before trial? Shortly before trial, Your Honor. Shortly. Yes. The time gap is between the initial proffer and when he refuses to take a polygraph, which happens before trial. And what is your policy when that refusal occurs? Is it at that point that you should notice defense counsel? He refuses. Oh, I'm sorry. There's confusion about the record here, I think. I must be confused because it's not sounding accurate to me. So I think what happened is we notified defense counsel that we thought he was lying and we wanted him to take a polygraph, and that all happened before trial. The only thing that happened two years earlier is that he debriefed with the government and lied. That's what happens earlier. What happens later is the notification that we'd like him to take a polygraph. We ask him to take a polygraph. He refuses, and we say, well, we're going to introduce that evidence at trial. And that's when, when you ask him to take it and he refuses, then you tell him we're going to use this evidence at trial. I think so. I'm not sure it's quite, I don't know if it was quite that stark, but that's substantially accurate from what I can recall. And when was the second interview, and what was it, was it the same kind of thing or was it new, wanting him to cover new factual evidence or? I don't recall, Judge Autry. I don't think that that evidence came in at trial, so I'm not sure that that. Okay. Well, that's irrelevant, isn't it? It doesn't affect the result. And that gets to sort of the last point, which, Judge Schrantz, even if the court were to find anything about this troubling, the statements that came in were basically statements of him admitting he was there but denying that the crimes occurred. So he never actually admitted that the crimes occurred or that he was, or sorry, admitting his role in the crime. The problem with counselor is one of fair notice. I don't think it's an excuse that, well, we didn't have that much to use against him. The question is what is the appropriate methodology for the treatment of this issue and what is your policy on the treatment of this issue as far as giving notice to someone who's facing trial? I'm sorry. Again, I think we're talking past each other. I was really trying to talk about harmless error, Judge Schrantz, that even if the court were troubled by something we did, it would not have changed the result of the trial and so therefore it could be affirmed on harmless error. That's the third of the grounds we present in our brief. I'm sorry. That's a fair argument. My concern has to do with the preceding issue. That's correct, and I don't think that would vary depending on whether it was important or unimportant whether or not we behaved appropriately here. I would suggest to the court that we did. It was before trial. He can't claim surprise at trial. He could have continued negotiating a plea agreement at that point. He opted not to, and that did provide him at least with an ability to fashion his trial strategy around what had happened. With the remaining time, I'll move to the juror issue, if that's all right with the court. The district court here on the jury issue carefully adhered to precedent in responding to what happened. It held a three-hour REMER hearing. It individually questioned each juror outside the presence of the other jurors. It instructed all of those jurors to cease any communications with their fellow jurors about what had happened and what they discussed in court. It dismissed the two jurors who could not remain impartial, and it reasonably credited the jurors who could. Now, Judge Ketledge, I think you asked towards the beginning of this argument about whether this essentially boils down to a matter of credibility. It does. In this court's cases from Pinnell forward are clear that these circumstances where a district court is questioning jurors qualify as credibility findings. The district court is in the best place institutionally to listen to the juror's tone of voice, demeanor, all of those things that don't translate onto a transcript. Here, the district court did that. The district court found that all the jurors but the two the district court dismissed could remain fair and impartial based on the answers that the district court heard and observed and reasonably credited. Now, defense counsel raises a couple of points that deserve at least a quick rebuttal. First, defense counsel complains without actually specifying what questions the district court should have asked, but the district court did not ask the right questions. But the district court here gave defense counsel the opportunity to propose questions over and over again. If the court reads the transcripts of the juror questioning, it will notice that for several of these jurors, the juror finishes answering questions. The district court asks defense counsel if they have any more questions, and then when defense counsel has more questions, the district court invites the juror back to ask those questions. So defense counsel had the opportunity to ask and propose any questions they wanted if they thought the district court should have done so. So to claim that the district court should have asked a different question, we don't know what that question is because they won't actually specify it here, but to claim that the district court should have asked a different question, that's forfeited. At the very least, it's forfeited. They had the opportunity to propose questions and they didn't. As to a couple of jurors, that's actually waived. And I'll refer to juror number three, which defense counsel spent some time talking about today. If the court goes back to page 7655 to 7657, juror number three had told the clerk that, or according to the clerk, that, well, the defendants aren't taking this seriously and the jurors are talking about their problems. And then when he came into court and he was questioned, he focused on the jurors talking about their problems and said that that was what had actually been bothering him. The district court asked defense counsel if they had any questions, if they wanted to explore the other part of the answer. And all of those defense counsels said no, they didn't. Now, now that we're in appeal and they've lost, they've flipped around their position. They've gone 180 degrees and said now it's per se reversible error that the district court did not do what the defense counsel told them not to do and that the district court should have asked these additional questions. And there's a reason waiver rules exist. This is the reason waiver rules exist. So you don't tell the district court to do one thing and then complain in appeal that the district court should have done something else. On the supplemental instruction, very quickly, the district court here did give a supplemental instruction on aiding and abetting. It did respond before the jury finished deliberations. It didn't respond right away because it had trouble responding to a hypothetical that it viewed as too factually close to the circumstances of the case. It had trouble understanding some questions after that. But it did respond eventually before the jury finished deliberating and rendered its verdict with a clarification of the aiding and abetting standard. That was appropriate. It was certainly not an abuse of discretion. And we would ask that the court affirm the district court's handling of that issue. I'm happy to answer, with 30 seconds left, I'm happy to answer any questions on that or any other remaining issues, either addressed here or otherwise. Your opposing counsel argues that Mr. Gills is factually and age and for other circumstances distinct from the remaining defendants. What is your response to that? Well, three responses. One, he's distinct in that he's the only one without a mandatory life sentence. He has a statutory maximum of life on the wreath of conspiracy, but he doesn't have a mandatory life. So the district court did have to address it under the guidelines and address the sentence under the guidelines. I see my red light is on. Second is that when he committed these murders, he wasn't quite so young. He committed these murders over a number of years. Third, yes, he was only convicted of attempted murder for the Vicar shootings. But if the court looks at the Malachi Wilson murder, which resulted from Leon Gills' very public dispute with Joan A. Wilson, Leon Gills is the person who ordered Jonathan Oldham to murder Malachi Wilson. And the court recalls Jonathan Oldham then ran outside, chased Malachi Wilson down the street, and executed him with three bullets in the head in the middle of Lapeer Road. So Leon Gills is just as callous as his co-defendants. All right, thank you for your arguments. We'll hear rebuttal in a minute apiece. Again, Steve Jagraba here for Jonathan Oldham. There are a couple of things I want to point out to the court. I would point to court as it relates to Juror 3 to look at pages 7885, 7884, 7885, and the second round of questioning on June 17th. United States talks about June 16th and Juror 3's answers to the court's questions. Go look at June 17th. The court does not follow up and ask questions, but he assumes impartiality after these second round of reports that come to the court's attention. The second thing is, there's a concept of bias in fact. Judge Franchard in an earlier argument this morning said it's so obvious you just can't ignore it. I think that's exactly what happens in this case. It's so obvious there's this cloud over this jury, there's this cloud over this trial, and the court has to make thorough inquiry of jurors. He doesn't do so with 3 or 10. Next, in answer to the questions put out here this morning, Jonathan Oldham was born in 1989. At the time of this conspiracy starts, he's 13 years old. From September of 2004 until May of 2006, he's in juvenile custody. The last thing is just to point out real quickly. You just wind it up. I would ask the court to look at the quality of the limiting instructions and likely arguments that were made in relation to the jury's impairment. Thank you. The Jonathan Parker shooting occurred on July 17, 2004. I don't know the precise age of Mr. Norwood at that time. I think he was born in the middle 80s. He was interviewed by two officers while he was in federal custody. I don't recall that he admitted or acknowledged he was a member of a gang. He said he used a name. I think it was Hot Boys, not Howard Boys, not Murderville. The Murderville name, as indicated by the record, didn't come up until about 2006. He sold drugs, and that's what exactly was going on in that neighborhood. It had been going on in that neighborhood for decades. The evidence the government looks to about the existence of rules relating to sale of drugs, gang signs, tattoos, and all those things come from evidence that they haven't plugged into any particular date. As I've indicated in our reply brief, they all relate to testimony putting it in time period after Mr. Norwood left, after 2005. Finally, I'd just like to point out that all of the cases that relate to this have more indicia of organization and animating purposes than are present with regard to Mr. Norwood. This case, the courts case in Wilson, the Ninth Circuit case in Banks involves a Crips gang. Hackett involved a person who was the top dog in a group who went to extraordinary lengths, and Concepcion, a Second Circuit case from a decade before that, involved over 100 people involved in an organization. Cooper, Witten, they all involve either organized nationally known gangs that have rules and procedures. None of that was present according to the testimony that Mr. Goetz has now referred to for the time period before 2005. Thank you. Thank you, sir. Housing Council gave three different buckets that he said helped prove this animating purpose. One was publicize the dispute, one was publicize the murder, and then the third was the disproportionate response. Obviously, the first two don't apply to Timothy Walker at all because he had nothing to do with either of the first two. So then it comes down to disproportionate response. There's no case law that says disproportionate response is a way of showing that the purpose of the murder was to maintain or enhance your position within the offense. But more than that, when is a shooting of another individual not a disproportionate response unless it's... Well, sometimes it's more disproportionate than others, perhaps. Sometimes it is, but it's never not a disproportionate response. And it doesn't follow that somebody who does a disproportionate response is therefore doing it to increase their purpose within the organization. Sometimes people are crazy, sometimes people are mean, sometimes people are mad. All right. Your Honors, the timeline was supplied in my reply brief. The first session was April 20, 2011. The second session was April 16, 2012. In December 2013, the government declared a breach, said they were going to release the information. We litigated it. It wasn't until February 20, 2014, months before the trial at that hearing that Jonathan was offered and declined the polygraph. It's not harmless. The shooting of Alfonso Golfin was unknown to him as to why. Golfin testified, but he didn't know who shot him. He didn't know why. There were four people in the car, the shooter, Mr. Evans, two girls, and Jonathan Walker. Evans declined to testify, even though he had a cooperation agreement. The girls refused to testify. John's words were the only thing that put Jonathan even at that scene. That can hardly be harmless. Your Honors, the last thing I wanted to do was quote a site out of, if I can find it. In interpreting immunity agreements, as with plea agreements, we must be mindful of the fact that defendants' underlying contract right is constitutionally based and, therefore, reflects concerns that differ fundamentally from and run wider than those in the commercial contract law. Furthermore, in federal prosecutions, such as the one involved here, the Court's concerns run even wider than protection of the defendant's individual constitutional rights to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in the federal scheme of government. And that is in U.S. v. Smith, 976 Bed 2nd, 861. Thank you. Thank you. Thank you, Your Honors. With regard to the special jury instruction, the fact that the Court did ultimately or gave an abetting instruction from the beginning and ultimately did clarify it for the jury does not cure the fact that by telling the jury it had asked a question, that the Court was prohibited from answering when it was required under Nunez to actually answer, didn't cure the fact that the Court improperly guided the jury, quote, in such a substantial way as to violate due process. And I'm citing here United States v. Turner, which is the page 34 of the brief, and U.S. v. Perez-Tosta, which is the same page of the brief. That's Mary Somaz to that. And Mr. Guest refers over and over again to all the defendants, all the defendants. His last comment to you was that Mr. Gills was as callous as any of the rest. He was not present for the Marion Harder murder. He was actually in a Houghton Lake, Michigan, detention facility, contrary to what the government put in its original brief that they went to his apartment. He wasn't present for any of these murders. As a matter of fact, he wasn't charged in the indictment at any point with a delivery of crack cocaine. What he did do over and over again to the great discomfort of the government was stood up in clubs around the city of Flint doing gangster rap music, talking about language that I'm not going to put on this record. But that's why he's been focused upon in this gang, not because, as Eddie Williams, because a mentor of some sort. So it makes it particularly galling that his constitutional rights resulted in a state court conviction, a state court sentence that was illegal because the initial warrant was illegal. And then, just to give him a double whammy, he comes along and gets enhanced to a life sentence for the same constitutional violation by the government. Thank you. Thank you, sir. We're aware that Mr. Simington, Mr. Yeager, Mr. Garowitz, and Mr. Roberts, each of you was appointed by the Criminal Justice Act, and we sincerely appreciate your vigorous advocacy on behalf of your clients. You've all done a fine job. Mr. Shadd, as always, you've done a fine job. Mr. Garowitz, the last time we saw you, Judge Stranch and I, we thought we had it in hand, and now it's off to the Supreme Court, so we'll see how that turns out. But we appreciate the fine advocacy that you've all brought to this case. Thank you. Clerk may adjourn court. Thank you. Thank you. Thank you. I wish you a good one. Thank you. Thank you. Thank you. Thank you. Thank you.